John Meyer, MT Bar #11206
Cottonwood Environmental Law Center
P.O. Box 412 Bozeman, MT 59771
John@cottonwoodlaw.org
(406) 546-0149

*Attorney for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| GALLATIN WILDLIFE ASSOCIATION; COTTONWOOD ENVIRONMENTAL LAW CENTER | )<br>)<br>)<br>) Cause No. |
| Plaintiffs, | )<br>)<br>) COMPLAINT FOR |
| vs. | ) DECLARATORY, INJUNCTIVE,<br>) AND MANDAMUS RELIEF |
| DALE OLSON, IN HIS OFFICIAL CAPACITY AS MADISON DISTRICT RANGER OF THE BEAVERHEAD DEERLODGE NATIONAL FOREST; UNITED STATES FOREST SERVICE | )<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants | )<br>)<br>)<br>)<br>)<br>) |

**INTRODUCTION**

1.  This case challenges the U.S. Forest Service for failing to complete long over-due analysis of the environmental impacts of domestic sheep grazing on federal land managed by the Beaverhead Deerlodge National Forest in southwest Montana. Defendant U.S. Forest Service previously told Plaintiff Gallatin Wildlife Association that the analysis sought in this complaint was scheduled for 2005. *Gallatin Wildlife Association v. United States Forest Service,* 2:15-cv-00027-BMM (Doc. 15-7). The analysis has still not been completed.

2.  On June 14, 2016, Plaintiff Gallatin Wildlife Association prevailed in a lawsuit that required the Forest Service to determine whether it needed to prepare the supplemental National Environmental Policy Act analysis that is sought in this complaint. *Gallatin Wildlife Association v. United States Forest Service,* 2:15-cv-00027-BMM (Doc. 148). The district court ordered the Forest Service to make the determination on an "expedited basis." *Gallatin Wildlife Association v. United States Forest Service,* 2:15-cv-00027-BMM (Doc. 148).

3.  On December 26, 2017, Defendant Dale Olson determined supplemental NEPA analysis was not necessary in part because the agency had "plans to begin a new NEPA process in 2018." Determination to Comply with the District of Montana Court Order, available at https://www.fs.usda.gov/project/?project=50067 (last visited December 28, 2022).

4.  The analysis has still not been completed.

5.  The Forest Service's determined that supplemental NEPA is not required because new impacts to grizzly bears, bighorn sheep, and recreation are insignificant.

6.  The determination is directly contradicted by evidence the agency had before it.

7.  Plaintiffs now ask the Court to reverse the Forest Service's determination that supplemental NEPA is not necessary, order the Forest Service to prepare supplemental NEPA analysis and enjoin domestic sheep grazing until the analysis is complete.

## PARTIES

8.  Plaintiff Gallatin Wildlife Association is an all

volunteer conservation organization that promotes the restoration, maintenance, and perpetuation of native wildlife and their habitat. Gallatin Wildlife Association is based in Bozeman, Montana.

9. Plaintiff Cottonwood Environmental Law Center is a nonprofit conservation organization dedicated to protecting the people, forests, water and wildlife of the American West.

10.    Members and staff of the plaintiff organizations use and enjoy, on a continuing and ongoing basis, the lands of the Beaverhead-Deerlodge National Forest, including the domestic sheep grazing allotments that are authorized in the Gravelly mountains by the U.S. Forest Service. Plaintiffs' members' hike, hunt, camp, photograph, mountain bike, meditate and engage in other spiritual and recreational activities in the domestic sheep allotments at issue in this case. The Plaintiffs' members derive aesthetic, recreational, inspirational, educational, and other benefits from their activities in these allotments on a regular and continuing basis and intend to do so frequently in the future, including during the summer of 2023 and 2024.

11.     The above-described interests of the Plaintiffs have been, are being, and, unless the relief prayed for is granted, will continue to be adversely and irreparably injured if domestic sheep grazing is allowed to proceed in the Gravelly mountains. These are actual, concrete injuries to Plaintiffs, caused by Defendants' failure to comply with NEPA and the APA. The above-named injuries would be redressed by the relief requested in this Complaint.

12.     Defendant U.S. Forest Service is an administrative agency within the U.S. Department of Agriculture, and is responsible for the lawful management of our National Forests, including the Beaverhead-Deerlodge National Forest.

13.     Defendant Dale Olson is the Madison District Ranger and the official responsible for deciding not to prepare supplemental NEPA based on new information provided by Plaintiffs.

## JURISDICTION AND VENUE

14.     Jurisdiction is proper in this Court under 28 U.S.C. §

1331 (federal question), 28 U.S.C. § 1361 (mandamus), because

this action involves agencies of the United States as Defendants,

and arises under the laws of the United States, the

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq. and

the National Environmental Policy Act, 42 U.S.C. 4321 et seq.

15.     An actual, justiciable controversy exists between

Plaintiffs and Defendants. The requested relief is proper under 28

U.S.C. §§ 2201-02 and 5 U.S.C. §§ 705 and 706. Venue is proper in

this Court pursuant to 28 U.S.C. § 1391(e) because a substantial

part of the events or omissions giving rise to the claims here in

occurred within this judicial district and because Plaintiffs are

located in the district.

16.     The federal government has waived sovereign

immunity in this action pursuant to 5 U.S.C. § 701.

## FACTUAL BACKGROUND

17.     Grizzly bears are protected as a threatened species

because their populations are isolated and disconnected. *Crow*

*Indian Tribe v. United States*, 343 F. Supp. 3d 999, 1014 (D. Mont.

2018) citing 40 Fed. Reg. 31,734  (July 28, 1975).

18.     Grizzly bears were also placed on the list of threatened species because of livestock-bear conflicts on public lands outside of Yellowstone National Park. 40 Fed. Reg. 31734, 31734.

19.     The Gravelly Mountains in southwest Montana are one of the most important grizzly bear corridors in the lower 48 because they can connect the Northern Continental Divide and Greater Yellowstone populations of grizzly bears.

20.     The domestic sheep grazing being challenged here is responsible for killing grizzly bears that could connect the isolated populations and move them closer to being taken off the list of threatened species.

21.     The U.S. Forest Service permits private individuals to graze more than 15,000 domestic sheep across more than 15,000 acres in the heart of this important grizzly corridor.

22.     Grizzly bears, black bears, wolves, coyotes, foxes, and eagles eat domestic sheep in the Gravelly Mountains.

23.     These predators are killed every year for eating domestic sheep in the Gravelly Mountains.

24.     Federal agents killed the wolves below for eating

7

domestic sheep that were grazed in the Gravelly Mountains.



25.    Plaintiffs' members and the public cannot enjoy the Gravelly Mountains because of the private livestock grazing. Plaintiffs have submitted declarations from members explaining how the guard dogs pose a risk to them when hiking and mountain biking.

26.    The Forest Service will not allow bighorn sheep to migrate back to Bighorn Mountain in the Gravelly Range because of domestic sheep. The domestic sheep carry pneumonia that cause wide-spread die-off of bighorn populations.

27.     The Forest Service prepared National Environmental Policy Act analysis for the seven domestic sheep allotments between the years 1968 and 2000.

28.     The Forest Service informed Gallatin Wildlife Association in 2004 that it scheduled revised NEPA analysis for the seven domestic sheep allotments in 2005.

29.     In 2015, Plaintiffs filed a lawsuit challenging the Forest Service's failure to determine whether to prepare supplemental NEPA analysis for the domestic sheep Allotment Management Plans in light of new information. *Gallatin Wildlife Association v. United States Forest Service,* 2:15-cv-00027-BMM.

30.     The Court ruled that the Forest Service violated NEPA by failing to determine whether the new information was significant. *Gallatin Wildlife Association v. United States Forest Service,* 2:15-cv-00027-BMM (Doc. 148).

31.     On June 14, 2016, the Court ordered the Federal Defendants to remedy the deficiencies on an "expedited basis." *Gallatin Wildlife Association v. United States Forest Service,* 2:15-cv-00027-BMM (Doc. 148 at 36).

32.     In December 2017, the Forest Service determined supplemental NEPA analysis was not required, "based on the fact that the [Beaverhead Deerlodge Nationl Forest], consistent with the Rescissions Act, plans to begin a new NEPA process in 2018 for the [Allotment Management Plans]."

33.     The District of Montana had already determined the Rescissions Act does not apply. *Gallatin Wildlife Association v. United States Forest Service,* 2:15-cv-00027-BMM (Doc. 148 at 30-33).

34.     In 2013, the Forest Service prepared a National Allotment NEPA Schedule that indicates the NEPA analysis for the seven domestic allotments in the Gravelly Mountains would be completed in 2019.

35.     On September 14, 2018, the Forest Service published a notice in the Federal Register that it was going to complete one Environmental Impact Statement for the seven domestic sheep grazing allotments. The agency indicated a draft EIS was expected to be published in March 2019 and a final EIS in October 2019. 83 Fed. Reg. 46701.

36.     The Forest Service has still not published a Draft EIS for the allotments.

37.     On October 1, 2020, the Beaverhead Deerlodge National Forest published a Schedule of Proposed Actions that listed the NEPA analysis and an expected decision for the seven domestic sheep allotments to be completed and implemented in October, 2020. https://www.fs.usda.gov/sopa/forest-level.php?110102 (last visited November 27, 2022).

38.     On October 1, 2022 the Beaverhead Deerlodge National Forest published a Schedule of Proposed Actions that estimated a draft EIS for the seven domestic sheep allotments to be completed in July 2022 and a decision in December 2022. https://www.fs.usda.gov/sopa/forest-level.php?110102 (last visited December 28, 2022).

39.     The Forest Service has still not issued a draft EIS.

40.     The Forest Service's undue delay in completing the analysis is a violation of NEPA.

41.     The Forest Service was ordered to evaluate the significance of new information to determine whether

supplemental NEPA analysis for the seven allotments was required. *Gallatin Wildlife Association v. United States Forest Service,* 2:15-cv-00027-BMM (Doc. 148 at 36).

42.    The Forest Service solicited public comment and Plaintiffs submitted comments.

43.    The Forest Service responded to Plaintiffs' comments about guard dogs by stating, "we know of no displacement of native wildlife by guard dogs." Final Review Appendix C at C-74 (comment 8-66).

44.    The Forest Service had information in its possession stating guard dogs have displaced grizzly bears eating domestic sheep. *Gallatin Wildlife Association v. United States Forest Service,* 2:15-cv-00027-BMM (Doc. 12 at 8).

45.    The entire purpose of guard dogs is to displace grizzly bears and other native predators from the area. *E.g.*, *Gallatin Wildlife Association v. United States Forest Service,* 2:15-cv-00027-BMM (Doc. 36-7).

46.    Plaintiffs told the Forest Service the grazing was having significant impacts on its members use of the area. Final

Review Appendix C at C-74 (comment 8-66).

47.    In response, the Forest Service stated "guard dogs only
react if sheep are being harassed or harmed. There have been
no reported incidences of conflicts between guard dogs and
recreating humans in the Gravelly Landscape" and it is "not
aware of any literature regarding recreational conflicts with guard
dogs." Final Review Appendix C at C-74 (comment 8-66).

48.    The Forest Service failed to consider the many
declarations from Plaintiffs' members that reported conflicts.

49.    The Forest Service had literature in its possession
regarding recreational conflicts with guard dogs. *Gallatin Wildlife
Association v. United States Forest Service,* 2:15-cv-00027-BMM
(Doc. 36-7 at 6-8).

50.    Plaintiffs provided the Forest Service with a
government bulletin that states guard dogs "may confront
unfamiliar people (e.g., hikers and bikers) who inadvertently
approach the sheep or other livestock; this can be an *important
consideration for producers who periodically graze livestock on
public lands.* To reduce conflict, livestock producers should ensure

that signs indicating the presence of LPDs are readily visible."

*Gallatin Wildlife Association v. United States Forest Service,* 2:15-cv-00027-BMM (Doc. 36-7 at 6) (emphasis added).

51.     Plaintiff Cottonwood Environmental Law Center told the Forest Service supplemental NEPA was required because of impacts to grizzly bears. In particular, Cottonwood reminded the Forest Service that in 1991, the U.S. Fish and Wildlife Service issued a Letter of Concurrence for its Biological Assessment of the Fossil-Hellroaring Allotment that determined domestic sheep grazing in the allotment was not likely to adversely affect grizzly bears based on assurances that "any predator control conducted in the area will be non-lethal to grizzly bears." Final Review Appendix C at C-110-111 (comment 10-16).

52.     Cottonwood commented that supplemental NEPA analysis was required because at least one grizzly bear had been killed on the Hellroaring Allotment because of the domestic sheep grazing. Final Review Appendix C at C-110-111 (comment 10-16).

53.     In response, the Forest Service directed Cottonwood to Responses 8-73, which states "there has not been a management-

related removal of grizzly bears in the Gravelly Mountains due to domestic sheep depredation since 1986." Final Review Appendix C at C-110-111 (comment 10-16).

54.    The grizzly bear in the photo below was killed in the Fossil-Hellroaring Allotment in 2013 after killing domestic sheep. *Gallatin Wildlife Association v. United States Forest Service,* 2:15-cv-00027-BMM (Doc. 12).



55.     The U.S. Fish and Wildlife Service has documented at

least five grizzly bear mortalities because of domestic sheep

conflicts between the years of 2000-2018.

56.     The Forest Service relied on a Categorical Exclusion to

demonstrate that full NEPA analysis was not required for the

adoption and implementation of the Hellroaring Allotment Plan.

57.    Where the Forest Service has relied on a Categorical

Exclusion in this manner, the trigger for preparing supplemental

NEPA analysis is found within the Forest Service Handbook:

> If the new information indicates that extraordinary
> circumstances are now present and the proposed action may
> have a significant impact on the human environment, file a
> notice of intent to prepare an EIS. If the new information
> indicates that extraordinary circumstances are now present but
> the significance of the impacts on the human environment are
> uncertain, prepare an EA.

58.    Any effect on a threatened or endangered species

constitutes extraordinary circumstances. *See Riverhawks v.*

*Zepeda*, 228 F. Supp. 2d 1173, 1189 (D. Or. 2002) (citing 40 C.F.R.

§ 1508.4).

59.    The Forest Service violated NEPA by failing to prepare

an EA or EIS for the Fossil-Hellroaring Allotment.

60.    The Forest Service authorizes more than 15,000

domestic sheep to graze in the Gravelly Mountains of southwest

Montana.

61.    The domestic sheep that are grazed in the Gravelly

Range are trailed through the Snowcrest Mountains.

62.     The Forest Service has not analyzed the impacts of trailing domestic through the Snowcrest Mountains.

63.     At least one grizzly bear has been killed because of sheep trailing associated with the Gravelly Mountains.

64.     In 1900, there were over 100,000 bighorn sheep across the state of Montana.

65.     Today, fewer than 7,500 bighorn sheep remain in Montana.

66.     Bighorn sheep are not allowed on Bighorn Mountain in the Gravelly Range because of domestic sheep grazing.

67.     Pneumonia and other diseases spread by domestic sheep is a major cause in the decline of bighorn sheep numbers.

68.     Montana Fish, Wildlife, and Parks has previously acknowledged that bighorn sheep are native to the Gravelly Range and existed long before the invasive domestic sheep were introduced.

69.     The Chief of the U.S. Forest Service ordered the Beaverhead Deerlodge Forest to look at whether its 2009 Forest Plan contained adequate management direction for bighorn sheep.

70.     The Forest Service prepared a "draft" report for the Chief of the Forest Service on February 10, 2010 that states bighorn sheep can go anywhere they want on the National Forest.

71.     The Court ordered the Forest Service to prepare a supplemental Environmental Impact Statement for the Forest Plan because the agency had entered into an undisclosed Memorandum of Understanding ("MOU") with the domestic sheep producers that allows them to kill big horn sheep on Beaverhead Deerlodge National Forest lands. *Gallatin Wildlife Association v. United States Forest Serv.*, 2:15-cv-00027-BMM (Doc. 148 at 37).

72.     The Forest Service completed a supplemental EIS for the 2009 Beaverhead Deerlodge National Forest that addresses the impacts of three Memorandums of Understanding that allow for the killing of bighorn sheep that come near domestic sheep being grazed in the Gravelly Range.

73.     According to the SEIS, in the 13 years since bighorn sheep were reintroduced to the Greenhorn Mountains, bighorn sheep and permitted sheep on the BDNF have not been found in close proximity. January 2018 SEIS at 30.

74.    A U.S. Bureau of Land Management employee that works in the "Range" department of the agency reported to Montana Fish, Wildlife, and Parks a dead bighorn ewe on Black Butte Mountain adjacent to a domestic sheep allotment.

75.    Sheep herders have reported bighorn ewes up Standard Creek near a domestic sheep trailing route.

76.    The domestic sheep that are grazed in the Gravelly Range are trailed through the Snowcrest Mountains.

77.    Bighorn sheep have been documented near the trailing route.

## STATUTORY BACKGROUND

78.    The National Environmental Policy Act is "our basic national charter for protection of the environment." *North Idaho Community Action Network v. United States Department of Transportation,* 545 F.3d 1147, 1153 (9th Cir. 2008).

79.    "An agency must remain alert to new information that may alter the results of its original environmental analysis and 'continue to take a hard look at the environmental effects of its planned action, even after a proposal has received initial

approval.'" *Gallatin Wildlife Association v. United States Forest Serv.*, 2016 U.S. Dist. Lexis 77208 at *36 (D. Mont. 2016) quoting *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 557 (9th Cir. 2000).

80.    An agency decision not to prepare supplemental NEPA analysis can be challenged. *E.g.*, *Price Rd. Neighborhood Ass'n v. United States DOT*, 113 F.3d 1505, 1510 (9th Cir. 1997).

81.    In determining whether an agency's decision not to prepare supplemental NEPA is arbitrary and capricious, courts must consider whether the agency has taken the requisite "hard look" at the environmental consequences. *Price Rd. Neighborhood Ass'n v. United States DOT*, 113 F.3d 1505, 1511 (9th Cir. 1997) (citation omitted).

82.    Whether a supplemental EA is required depends on the significance of the new impacts. *Price Rd. Neighborhood Ass'n,* 113 F.3d *at* 1510.

83.    A plaintiff can prevail on such a claim by showing the agency failed to carefully consider the new information, evaluate its impact, or failed to support its decision not to supplement. *E.g.*,

*Id.* citing *Animal Defense Council v. Hodel*, 840 F.2d 1432, 1439 (9th Cir. 1988), modified 867 F.2d 1244 (9th Cir. 1989).

84.    "[I]f the environmental impacts . . . are significant or uncertain, as compared with the original design's impacts, a supplemental EA is required." *Idaho Sporting Congress v. Alexander*, 222 F.3d 562, 566 (9th Cir. 2000) (quoting *Price Rd Neighborhood Ass'n*, 113 F.3d at 1508-09).

85.    District courts have jurisdiction "to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff," pursuant to the Mandamus Act, 28 U.S.C. §1361, and a similar provision of the APA, 5 U.S.C. §706(1), which allows courts to compel "agency action unlawfully withheld or unreasonably delayed."

86.    Mandamus is warranted when an agency's delay is egregious. *Agua Caliente Tribe of Cupeño Inians of Pala Reservation v. Sweeney*, 932 F.3d 1207, 1216 (9th Cir. 2019).

87.    A six year delay is egregious. *Id.* (collecting cases).

88.    When determining whether a delay is unreasonable,

courts consider a six-factor standard—the so-called *Trac* factors—

established in *Telecoms. Research and Action Ctr (TRAC) v. FCC*,

750 F.2d 70, 79-80 (D.C. Cir. 1984).

89.    Those factors are as follows:

> (1)the time agencies take to make decisions must be
> governed by a rule of reason; (2) where Congress has
> provided a timetable or other indication of the speed with
> which it expects the agency to proceed in the enabling
> statute, that statutory scheme may supply content for this
> rule of reason; (3) delays that might be reasonable in the
> sphere of economic regulation are less tolerable when human
> health and welfare are at stake; (4) the court should consider
> the effect of expediting delayed action on agency activities of
> a higher or competing priority; (5) the court should also take
> into account the nature and extent of the interests
> prejudiced by delay; and (6) the court need not find any
> impropriety lurking behind agency lassitude in order to hold
> that agency action is unreasonably delayed.

*Cmty. Voice v. United States EPA,* 878 F.3d 779, 786 (9th Cir.

2017) (quoting *TRAC*, 750 F.3d at 80).

## CLAIMS FOR RELIEF

## First Claim for Relief

I.    <u>The Forest Service rationale for not preparing
supplemental NEPA analysis for the outdated analysis
violates NEPA.</u>

90.    Plaintiffs incorporate all proceeding paragraphs by

reference.

91.    The Forest Service determined that supplemental NEPA analysis was not required, "based on the fact that the [Beaverhead Deerlodge Nationl Forest], consistent with the Rescissions Act, plans to begin a new NEPA process in 2018 for the [Allotment Management Plans]."

92.    The District Court has already determined the Rescissions Act did not relieve the agency of its obligation to prepare supplemental NEPA analysis. *Gallatin Wildlife Association v. United States Forest Serv.*, 2:15-cv-00027-BMM (Doc. 148 at 30-33).

93.    The Forest Service's failure to prepare supplemental NEPA analysis is arbitrary, capricious, and a violation of NEPA.

94.    Plaintiffs told the Forest Service that several predators have been killed because of the domestic sheep grazing, which is significant new information that triggered the need to prepare supplemental NEPA analysis. Final Review Appendix C at C-112 (comment 10-21).

95.    The Forest Service prepared a categorical exclusion for the Fossil-Hellroaring allotment.

96.     As part of its determination that supplemental NEPA analysis was not required because there was no significant new information, the Forest Service stated no grizzly bears have been killed on the domestic sheep allotments. Final Review Appendix C at C-80 (comment 8-73).

97.     A grizzly bear was killed on the Fossil-Hellroaring Allotment in 2013 because of sheep conflicts.

98.     The U.S. Fish and Wildlife Service has documented at least five grizzly bear mortalities in the Gravelly Mountains because of conflicts with domestic sheep.

99.     The Forest Service's failure to prepare an EA, EIS, or supplemental NEPA analysis for the Fossil-Hellroaring allotment is arbitrary, capricious, and a violation of NEPA.

100.    Plaintiffs told the Forest Service the grazing was having significant impacts on its members use of the area. Final Review Appendix C at C-74 (comment 8-66).

101.    In response, the Forest Service stated "guard dogs only react if sheep are being harassed or harmed. There have been no reported incidences of conflicts between guard dogs and

recreating humans in the Gravelly Landscape" and it is "not aware of any literature regarding recreational conflicts with guard dogs." Final Review Appendix C at C-74 (comment 8-66).

102.    The Forest Service failed to consider the many declarations from Plaintiffs' members that reported conflicts. *E.g. Gallatin Wildlife Association v. United States Forest Service,* 2:15-cv-00027-BMM (Doc. 115-6) (stating "During my last visit . . . I ran into domestic sheep. A guard dog noticed me and started barking loudly. It started moving towards me and scared me. I stopped hiking, turned around and headed back for my car. The incident reaffirmed why I do not bring my black lab to hike or hunt with me in the Gravelly Mountain Range where these allotments are located.")

103.    The Forest Service had literature in its possession regarding recreational conflicts with guard dogs. *Gallatin Wildlife Association v. United States Forest Service,* 2:15-cv-00027-BMM (Doc. 36-7 at 6-8).

104.    Plaintiffs provided the Forest Service with a government bulletin that states guard dogs "may confront

unfamiliar people (e.g., hikers and bikers) who inadvertently approach the sheep or other livestock; this can be an *important consideration for producers who periodically graze livestock on public lands*. To reduce conflict, livestock producers should ensure that signs indicating the presence of LPDs are readily visible." *Gallatin Wildlife Association v. United States Forest Service,* 2:15-cv-00027-BMM (Doc. 36-7 at 6) (emphasis added).

105.    The Forest Service's rationale for not preparing supplemental NEPA analysis is arbitrary, capricious, and a violation of NEPA.

## SECOND CLAIM FOR RELIEF

<u>The Forest Service's delay in completing the required NEPA analysis is a violation of law.</u>

106.    Plaintiffs incorporate all proceeding paragraphs by reference.

107.    The Forest Service told Plaintiff Gallatin Wildlife Association that the NEPA analysis for the seven domestic sheep allotments was scheduled for 2005.

108.    The Forest Service has still not completed the necessary analysis for the seven allotments.

109.    The Forest Service has taken an unreasonable amount of time to complete the NEPA analysis and determine whether continued sheep grazing is appropriate.

110.    The Rescissions Act does not apply because the Forest Service has already prepared NEPA analysis for the allotments in the first instance.

111.    The Forest Service's failure to discuss the potential impacts of the dangerous sheep guard dogs on Forest Users' health and welfare supports a finding of undue delay.

112.    The Forest Service has been telling the public it would complete this analysis for more than fifteen years—the agency has had plenty of time to complete activities of a higher or competing priority.

113.    The Forest Service's delay in preparing supplemental NEPA analysis for domestic sheep grazing in the Gravelly Mountains is egregious and a violation of NEPA, the Administrative Procedure Act, and the Mandamus Act.

## THIRD CLAIM FOR RELIF

<u>The Forest Service's Supplemental EIS is arbitrary and capricious and violates NEPA.</u>

114.    Plaintiffs incorporate all proceeding paragraphs by reference.

115.    The Court ordered the Forest Service to prepare a supplemental Environmental Impact Statement for the Forest Plan because the agency had entered into an undisclosed Memorandum of Understanding ("MOU") with the domestic sheep producers that allows them to kill big horn sheep on Beaverhead Deerlodge National Forest lands. *Gallatin Wildlife Association v. United States Forest Serv.*, 2:15-cv-00027-BMM (Doc. 148 at 37).

116.    The Forest Service completed a supplemental EIS for the 2009 Beaverhead Deerlodge National Forest that addresses the impacts of three Memorandums of Understanding that allow for the killing of bighorn sheep that come near domestic sheep being grazed in the Gravelly Range.

117.    According to the SEIS, in the 13 years since bighorn sheep were reintroduced to the Greenhorn Mountains, bighorn sheep and permitted sheep on the BDNF have not been found in close proximity. January 2018 SEIS at 30.

118.    A U.S. Bureau of Land Management employee that

works in the "Range" department of the agency reported to

Montana Fish, Wildlife, and Parks a dead bighorn ewe on Black

Butte Mountain adjacent to a domestic sheep allotment.

119.    Sheep herders have reported bighorn ewes up

Standard Creek near a domestic sheep trailing route.

120.    The domestic sheep that are grazed in the Gravelly

Range are trailed through the Snowcrest Mountains.

121.    Bighorn sheep have been documented near the trailing

route.

122.    The Supplemental EIS is arbitrary, capricious, and

violates NEPA.

## PRAYER FOR RELIEF

For all of the above stated reasons, Plaintiffs request that

this Court award the following relief:

A. Declare that the Forest Service determination not to

prepare supplemental NEPA for the allotment

management plans violates the law;

B. Declare that the Forest Service's Supplemental EIS

violates NEPA;

C. Order the Forest Service to prepare supplemental NEPA analysis by January 1, 2024;

D. Enjoin domestic sheep grazing on the Forest Service allotments until an EIS or supplemental NEPA analysis for the individual Allotment Management Plans is complete;

E. Enjoin domestic sheep grazing on the Forest Service allotments until an adequate Supplemental EIS for the Forest Plan is complete.

F. Require the Forest Service to post signs warning the public of the dangerous sheep grazing.

G. Award Plaintiffs their costs, expenses, expert witness fees, and reasonable attorney fees under the Equal Access to Justice Act and any other applicable statute;

H. Grant Plaintiffs any such further relief as may be just, proper and equitable.

*/s/* John Meyer
JOHN MEYER

*Attorney for Plaintiffs*